Filed 10/31/24  P. v. Mundi CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>HARBHAJAN SINGH MUNDI,<br><br>Defendant and Appellant. | F084785<br><br>(Super. Ct. No. VCF368642)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Melinda Myrle Reed, Judge.

The Law Office of Anthony P. Capozzi and Anthony P. Capozzi for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

In 2021, a jury convicted defendant Harbhajan Singh Mundi of first degree murder (Pen. Code, § 187, subd. (a); count 1) of his landlord, and mayhem (§ 203; count 3) and

assault with a firearm (§ 245, subd. (a)(2); count 4) of the landlord's son, and found true multiple enhancement allegations. (Undesignated statutory references are to the Penal Code.) In a separate phase of trial, the jury found defendant was sane at the time he committed the crimes.

On appeal, defendant asserts insufficient evidence supports each of his convictions, and he challenges the jury's finding that he was sane at the time of the commission of the crimes.

We affirm.

## FACTUAL BACKGROUND

In July 2018, Nizam Rajabali (Nizam), his son Jahan Rajabali (J.R.), and others met with defendant to negotiate the transfer of defendant's lease related to a property owned by Nizam. At some point, defendant pulled out a loaded firearm and started to shoot. J.R. managed to wrestle the gun away from defendant, but Nizam, J.R. and defendant were all shot during the incident. Shortly thereafter, defendant hit Nizam in the head with a hammer. Nizam ultimately died from the injuries he sustained.

In connection with the incident, defendant was charged with first degree murder of Nizam (§ 187; count 1), premeditated attempted murder of J.R. (§§ 664, 187; count 2), mayhem as to J.R. (§ 203; count 3), and assault with a firearm as to J.R. (§ 245, subd. (a)(2); count 4).[1] It was further alleged defendant personally used and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (b), (c) &

---

[1]Before trial, the defense sought to set aside the charges in counts 2, 3, and 4, arguing there was no evidence defendant had the intent required to sustain the attempted murder and mayhem charges, and evidence of "reckless conduct" was insufficient to establish the assault charge. The defense also argued the prosecution's theory of the case was inconsistent with an intent to kill finding with regard to the murder charge (count 1). In response, the People agreed to amend the aggravated mayhem charge (originally count 3) to simple mayhem on the grounds there was no evidence defendant sought to maim or disfigure someone with sadistic purpose. However, they argued there was sufficient evidence to support the other charges. The court agreed with the People, denied the motion to set aside the charges, and amended the charge in count 3 to simple mayhem.

2.

(d)) during the commission of counts 1, 2, and 3, he personally used a firearm during the commission of count 4 (§ 12022.5, subd (a)), and he personally inflicted great bodily injury during the commission of counts 2, 3 and 4 (§12022.7, subd. (a)).[2]

Defendant entered a not guilty plea to the charges, and later, a joint and/or alternative plea to not guilty by reason of insanity. In light of his not guilty by reason of insanity plea, the court, in accordance with section 1027, appointed two approved mental health professionals—Drs. Trisha Busby and Doriann Hughes—to evaluate defendant in connection with this issue and to provide their evaluations to the court and counsel.

*Prosecution Evidence*

**The July 24, 2018, Shooting**

Defendant leased a convenience store in Farmersville, California that was owned by Nizam and his wife. On July 24, 2018, Nizam, his wife, and their son, J.R., traveled from their home in Southern California to meet with defendant at the store regarding renegotiating and transferring the lease. Gurpreet Singh, the prospective buyer who was also a family friend of defendant and was dating defendant's daughter, testified he had called Nizam and set up the meeting two weeks earlier.

At trial, J.R. testified he and his parents arrived at the convenience store at around 10:00 a.m. Defendant greeted them with a smile. Defendant's wife, Gurjant Mundi (Gurjant), testified defendant was happy that morning because the store was going to be sold.

They went to the back room of the store where there were several other people, including Gurpreet Singh, Singh's father, and two of his friends. Gurjant was working at the counter in the front of the store while the meeting started in the back room. Everyone was talking for about 10 minutes about transferring the lease when defendant motioned

---

[2]The section 12022.7 great bodily injury enhancement as to count 3 appears to have been dropped as it does not appear on the verdict forms.

for Nizam to follow him out of the back room and into the store. Gurjant testified she overheard defendant and Nizam talking; defendant was telling Nizam about his health issues and Nizam said he could kick defendant out of the store at any time because he was the owner. Gurjant testified they were arguing over the amount for the lease—Nizam wanted more money and they did not have more money to give.[3]

According to J.R., defendant and Nizam returned to the back room approximately three to five minutes later. J.R. testified he saw defendant walking behind Nizam, holding a gun pointed at the back of Nizam's head. He stated defendant's finger was on the trigger. J.R. was approximately three to five feet away. He "pounced" on defendant and tried to get the gun away. As soon as J.R. got to defendant, he heard shots going off and Nizam fell to the floor. Defendant "kept shooting and shooting." After the shots, J.R. managed to get the gun away from defendant.[4] J.R. testified he hit defendant with the gun a few times before pointing the gun at defendant and trying to fire it, but there were no bullets left.

At trial, Gurpreet Singh testified he was not paying attention when Nizam and defendant walked back into the room because he was talking to Nizam's wife; he did not see a gun at that point. Singh heard J.R. say, "No, Harry. No, Harry," referring to defendant. And then he saw J.R. and another person run, and "that's when everything took place." Singh testified he saw J.R. and defendant's hands "pulling each other" and "shots were being fired." Everyone was "confused"; "nobody knew what happened." Singh testified he did not know who fired the gun; "both of them were holding each other's hand," and he did not see where the gun was pointed before it started shooting.

---

[3]The prosecution played footage from an officer's body camera of an interview with Gurjant after the incident. Gurjant did not tell the officer she heard Nizam say to defendant that he could kick him out of the lease.

[4]On cross-examination, J.R. testified his finger got caught near the trigger while he was trying to get the gun away from defendant; he had a mark on his finger afterwards.

However, Kristine Barklow, who had been a detective with the City of Farmersville Police Department at the time of the incident, later testified Singh told her he heard the shots being fired before defendant and J.R. were wrestling for the gun. Singh did not tell her he saw J.R. running towards the defendant, grabbing the gun, and then hearing gunshots after they started wrestling for the gun. Singh's father testified he did not know if J.R. got the gun from defendant before the shots were fired or after, when there were no more bullets, but he saw the gun in J.R.'s hands.

Thereafter, everyone ran towards defendant and pushed him out of the room. J.R. followed but he noticed his foot was bleeding profusely, causing him to slip. He had been shot twice; once in the neck and once in his right foot. J.R. testified regarding his injuries and related medical treatment. His neck had to be bandaged and he had to have multiple surgeries on his foot. Doctors removed the bullets and "put metal stuff in [his] foot." After the shooting, J.R. could no longer "sustain any physical activity" for long periods of time because his foot would start swelling or hurting. As a result, the injury to his foot "[p]retty significantly" affected his ability to do activities he used to frequently engage in, such as basketball, hiking, and biking; he no longer enjoyed them.

After the shooting, J.R. called 911 and reported "he shot my dad and me."[5] He tried to capture defendant; defendant was fighting him. According to Gurpreet Singh, Nizam's wife was holding onto J.R. and Singh got hold of defendant and took him outside the room because they were fighting. Singh yelled at defendant. Defendant told Singh he was scared.

As the police arrived, defendant ran behind the store counter and then to the back room. Gurpreet Singh ran after him. Singh explained he saw defendant run back and he knew Nizam was alone in the back room. Singh testified that when he went into the back room, defendant was on the floor. Singh and his father helped pick up defendant and

_____

[5]The People also introduced a 911 call made by Nizam.

Singh saw a hammer, so he grabbed it. Singh walked out of the back room with the hammer, showed it to the police, and then threw it aside. He denied seeing defendant strike Nizam with the hammer.

Officer Barklow testified she was dispatched to the store at 1:05 p.m. on July 24, 2018, in response to a 911 call regarding a possible gunshot wound victim at the location. When Barklow arrived, there were several people at the front door, and it was chaotic. She saw J.R. with the gun and ordered him to drop it; he complied. People were shouting that defendant was the perpetrator. Defendant ran to the back room and Barklow followed. Nizam had been shot in the abdomen. The People introduced the footage from Barklow's body camera taken that day.

Later that day, Barklow and a second detective conducted a recorded interview with defendant at the hospital after reading him his rights. The video and a transcript of the interview were admitted at trial. During the interview, Barklow asked defendant what happened that day. In response, defendant began detailing his history with the store. He stated he operated his business for 15 years. Initially, in 2003, defendant and Moyses Ramos leased the business. Defendant stated he and Ramos invested money into the business and Nizam, the landlord, "was not investing a single penny." In 2008, they told Nizam they were going to have to spend around $120,000 to get new gas pumps and Nizam said he would not increase the rent and he would renew the lease in 2013. But in 2013, when it was time to renew the lease, Nizam raised the rent. Defendant stated, "[H]e was just sucking our blood." Defendant bought out Ramos's stake in the business, and then construction started outside the store and business became very slow. Nizam "g[a]ve no relief," and defendant became depressed and wanted to sell the business. Defendant stated Nizam was "like more than Hitler," "more than a dictator," "like a Ga[d]afi," "[h]e don't think about other people or other people's families." Defendant stated he began taking medicine for depression, stress, and anxiety and, "[a]ll these things came from that Hitler."

6.

Defendant explained they had set up a meeting to sell the business that day. He admitted he put a loaded gun in his back pocket before the others arrived for the meeting because of "the way they were talking on [the] phone"; he stated he thought "they can hurt me." He believed "the son" was making fun of him and threatening to kick him out of the store. Defendant also stated the son said he could beat him up. Defendant felt threatened.

At some point during the meeting, defendant and Nizam went out of the back room to talk by the cooler in the store. Nizam said defendant had wronged him and was a "troublemaker." Defendant "got mad," "furious." As they were returning to the back room, defendant pulled out the gun from his back pocket and shot one time in the air; he was not aiming. He reported Nizam was two to three feet in front of him with his back to defendant. Defendant denied intending to hurt or kill Nizam. He stated he "got mad" and "just shot." He thought Nizam got hit in the leg or foot. He later stated he shot four bullets from the gun, which held five bullets. Then, Nizam's son J.R. grabbed the gun and shot defendant once without aiming. Then, J.R. tried to shoot defendant in the chest but there were no more bullets left. J.R. hit defendant with the gun and then followed him out of the back room and into the store, throwing bottles and saying he was going to kill him.

Officer Barklow received surveillance footage from the store that the People introduced at trial. The footage includes video recordings from four different camera angles but there is no audio in the footage. There were no cameras in the back room where the shooting occurred.

At trial, Officer Barklow identified some of the individuals that can be seen in the footage and narrated portions of the events occurring in response to questioning. She explained defendant's wife can be seen sitting behind the counter of the store. Then, J.R. and his mother enter the screen; J.R. can be seen shaking hands with Gurpreet Singh. Then, Nizam enters the frame. Later, Nizam and defendant can be seen talking in the

7.

store and then walking toward the back room. From another camera angle, Nizam can be seen walking in front of defendant towards the back room and defendant appears to be reaching for his back pocket as he exits the frame. Thereafter, defendant's wife can be seen reacting to something and walking toward the back room. Approximately a minute later, individuals, including defendant, can be seen leaving the back room.

After exiting the back room, defendant can be seen eventually running behind the counter at the front of the store and then returning towards the back room, away from the front of the store. From another camera angle, defendant can be seen grabbing something from under a cowboy hat on a shelf before he exits the frame towards the back room. Officer Barklow identified the object defendant grabbed as a hammer. Gurpreet Singh runs after defendant towards the back room and then reenters the frame a few seconds later with the hammer in his hand. Officer Barklow testified there was surveillance footage from the day before the incident showing defendant going to an area in the store where there are tools and the cowboy hat.

**Other Testimony**

A senior criminalist testified defendant's hands were swabbed for gunshot residue (GSR) following the incident, and analysis of the sample revealed particles consistent with GSR on defendant's right and left hands, meaning they had two of the three elements of gunshot residue (lead, barium, and antimony). There was also one particle that was characteristic of GSR on defendant's left hand, meaning defendant had all three elements of GSR. She explained, the presence of GSR does not establish who pulled the trigger, but it evidences one was in proximity to or touched a surface that had GSR on it at some point.

A hammer was seized from the scene and tested for fingerprints. A latent print on the hammer was identified as matching defendant's right index finger. The hammer also tested positive for the presence of blood. Nizam was identified as the major contributor

and defendant was a minor contributor to the mix of DNA obtained from the blood swab of the hammer claw.

The prosecution introduced sworn testimony from the now deceased pathologist who conducted an autopsy of Nizam's body. The pathologist opined that Nizam's primary cause of death was "[t]raumatic hemorrhage shock due to a penetrating gunshot wound to the abdomen." The gunshot wound was on the left side of Nizam's abdomen and the projectile had a left to right and slightly downward trajectory. Nizam also suffered blunt force trauma to the head, which contributed to his death. He had three semicircle-type lacerations on his head that were consistent with the head of a hammer. There was a skull fracture associated with one of the lacerations.

Gurjant Mundi testified she told Officer Barklow after the incident that defendant "is mentally ill" and "taking medicine." She reported defendant would say he was dying every day. He had lost "70, 80 pounds in one year." He would miss work and say his body was melting and shaking. She testified defendant would "cry every day" and had shown her his insurance policies. One day, on their way to temple, Gurjant and defendant saw a dead dog on the road and defendant thought he caught rabies. He went to a doctor and paid $1,000 to get shots for rabies.

### Denial of Defendant's Section 1118.1 Motion for Acquittal

Before presenting evidence, the defense made a section 1118.1 motion for acquittal, arguing there was no evidence defendant had the intent to commit murder with malice aforethought and premeditation; there was no evidence of attempted murder of J.R. because the evidence of intent was toward Nizam not J.R.; and there was "no general intent to commit mayhem on" nor "intent to assault [J.R.]." Accordingly, the defense requested counts 2, 3, and 4 and the premeditation and deliberation allegations as to the murder and attempted murder counts be dismissed. The People argued there was evidence of intent to kill and premeditation and deliberation, including evidence of

defendant's actions before, during, and after the shooting, the nature of the resulting injuries, and the number of shots fired.

The court granted the defense motion as to the special allegation that the attempted murder (count 2) was willful, deliberate and premediated. But it denied the motion as to the charged crimes and other allegations, concluding there was sufficient evidence to support a finding of willful, premeditated, and deliberate first degree murder (count 1), express or implied malice with regard to the attempted murder of J.R. (count 2), and general intent regarding mayhem and assault with a firearm (counts 3 & 4).

### Defense Evidence

#### Defendant's Testimony

Defendant testified on his own behalf. He explained he was born in India in 1955 and moved to the United States in 1985. He worked as a taxi driver in New York City for seven years and eventually moved to Farmersville in 1992 where he bought a convenience store. He sold the business after the terrorist attack on September 11, 2001. He was scared because a lot of Sikh people were killed after the attack; so, he and his wife went back to India for six months. Then, they returned to Farmersville and defendant started working with the individual to whom he had sold his store, Moyses Ramos.

In 2003, defendant and Ramos bought a 10-year lease for the Aztec store from Nizam. In 2008, defendant met with Nizam regarding renovations needed on the gas pumps at the store, which would cost approximately $150,000. They came to an understanding that defendant and Ramos would cover the renovations and the rent would stay the same, $2,000, when the lease renewed in 2013. But Nizam raised the rent to $3,000. Defendant testified he would call Nizam to ask him to do things for the business or if there were problems with it, and Nizam would yell at defendant, hang up, and not listen.

10.

Defendant's depression and anxiety started in 2017 and he began taking Xanax (generically known as alprazolam). Eventually, defendant went to a specialist in psychiatry who prescribed him Prozac and Risperdal (generically known, respectively, as fluoxetine and risperidone) in addition to the Xanax he was taking. Defendant asked Nizam and his wife to help with the rent for the store because there was construction occurring on the road where the store was located, so no vehicle could enter the store. They refused to help. In September 2017, defendant called Nizam and told him about his health problems. Specifically, defendant told Nizam he was dying and wanted to sell the business. Nizam hung up on defendant. Defendant testified he was losing lots of weight, felt weak and fatigued, and could not sleep. He recalled seeing a dead dog on the road and he thought the fumes from the dog would give him rabies, so he got four rabies shots. He was scared to handle coins at the store because he thought he could get a disease from them. When he started to feel weak, he felt like there was a smell coming from his body and his skin was rotting. In February 2018, defendant went to India where he saw a doctor who wanted to hospitalize him. Defendant refused because he needed to return to the United States to work.

Gurpreet Singh organized the meeting with Nizam to occur on July 24, 2018, for Singh to purchase the lease for the store from defendant. They set up escrow to begin that day. The day before the meeting, Nizam called defendant to talk about money and he demanded cash. Defendant was concerned about the meeting because he "did not have money" and Nizam "was scaring [him] on the phone." The mayor of Farmersville, Paul Boyer, came into the store the day before the meeting and defendant told him "if something happened to me … he will come to know…." Defendant was worried if he did not have the money Nizam requested, Nizam would hit him or kill him. Defendant testified that, on the phone, Nizam threatened to "kick the shit out of [him]" if he did not have the money. Defendant denied getting the gun the night before; he explained the gun was always at the store and loaded.

11.

Defendant testified that he went to work around 9:30 a.m. on July 24, 2018. He took the gun out of the closet and put it in his pocket that morning because he was scared of Nizam. He denied that he planned to kill Nizam and testified he had the gun in his pocket for his safety if Nizam attacked him. He denied putting the hammer under the hat on the shelf, but stated he knew it was there.

He explained, he spoke with Nizam and then they all went into the back room. Nizam was speaking to the buyers and asking for money from them and defendant to transfer the lease. At some point, defendant waved at Nizam to come out of the room so he could tell him he did not have the money. When defendant told Nizam he did not have money and would not give it to him, Nizam got mad and called him a "son of [a] bitch" and said he would kick him out and "kick [his] ass." Nizam started walking and defendant "got mad" and "walked after him." He reached into his back pocket and got the gun out. He testified he "wanted to scare him" and let him know, "I can fight with you if you hit me, if you kill me." Defendant held the gun in his right hand, pointing it up towards the ceiling. He was going to show it to Nizam, but before he reached Nizam, J.R. jumped over him and grabbed the gun. Defendant could feel J.R.'s finger by the trigger. Defendant testified, "My hands were there on the gun, and his hands were there. He was stronger. He has more control over the gun. I was very weak. I had no energy. So the gun started fighting [*sic*]. He had possession of the gun after that, when the gun started." "It happened so quick." Defendant testified he heard bullets firing, but he did not know Nizam or J.R. had been hit. He denied trying to shoot Nizam or J.R. and stated he had no animosity toward J.R. or intent to hurt him. Defendant had never met J.R. before that day. Defendant denied intending to kill Nizam. He testified he thought J.R. was trying to shoot him. He explained both his and J.R.'s hands were applying pressure on the trigger and he did not know how it got pulled. He asserted he did not have much pressure in his arms and "was very weak, to pull the trigger." He testified he and J.R. were struggling for the gun and the shots were going off. He admitted he told Officer

Barklow after the incident that he fired four shots before J.R. got the gun away and shot one shot. When asked why he stated during the interview after the incident that he pointed the gun at Nizam's arm though at trial he testified he pointed it in the air, defendant stated he "was very confused" during the interview and in pain. Defendant further testified he knew a person can die if they are shot. But he denied he knew that in 2018.

Defendant fell back and J.R. hit him with the gun before aiming it at defendant's chest and pulling the trigger two or three times while yelling at defendant. Gurpreet Singh took defendant to the store area, asking him what happened; defendant told him he was scared. J.R. came out of the back room and started throwing things at defendant and approaching him. Defendant ran behind the counter and then grabbed the hammer from under the hat because he wanted to arm himself. He ran to the back room. Nizam was on the phone, leaning on the table. Defendant testified Nizam tried to grab something and throw it at him and defendant "hit him in the head one time" with the hammer. He denied hitting Nizam three times as suggested by the autopsy report. After defendant hit Nizam, Nizam fell down again. Defendant testified he threw the hammer down. He recalled telling the EMT's that he "was having money trouble with the guy [he] shot"; but he stated he was referring to the fact the bullets came from his gun. He denied pulling the trigger.

**Testimony of Dr. Howard Terrell**

Howard Terrell, M.D., testified he is a licensed physician and surgeon and is board certified in psychiatry and forensic psychiatry. He obtained defendant's medical records and police records and interviewed defendant. Dr. Terrell put together a 31-page report in this case.

He explained he spoke to defendant's daughter Amrit Mundi (Amrit), who had medical training, and was familiar and worked with severely mentally ill people. She

13.

told Dr. Terrell that beginning around June 2017, defendant had become very preoccupied with the idea he was going to die. He could not sleep and expressed "an unreasonable fear that someone was going to come and kill him or rob him." Defendant asked Amrit to study at night so she could watch out for someone who might try to kill or rob him; he was "very paranoid, very irrational, very consistent with someone who's psychotic." She also told him defendant believed he got rabies from walking past a dog.

Dr. Terrell testified defendant's "belief that someone is killing him when there's no logical evidence … that anyone really was attempting to kill him in any way" "was strongly suggestive of a severe mental illness with paranoia and psychosis because it is being out of contact with reality, typically by hallucinations or delusions which are fixed on unshakeable thoughts." Dr. Terrell opined this is evidence defendant is "severely mentally ill."

Dr. Terrell explained defendant was prescribed Xanax, which can cause disinhibition, meaning where inhibition does not prevent an individual from committing a crime.[6] Dr. Terrell testified defendant was also prescribed a very low dosage of Risperdal, an antipsychotic medication that is used for the treatment of "psychotic mental disorders such as schizophrenia, major depressive disorders, severe, with psychotic features," "bipolar disorder," "and other conditions where people become psychotic, irrational, and out of character." He opined the dosage was very inadequate for defendant's condition. He also believed the dosage of Prozac defendant was prescribed was too low for his severe depression with psychotic feature.

Dr. Terrell reviewed notes from defendant's primary care physician from July 10, 2018, in which the physician documented that defendant did not have ideation of killing himself or someone else, or violent ideation. Dr. Terrell also reviewed documentation

---

[6]In later testimony, Dr. Terrell confirmed that defendant told him he had not taken Xanax on the date of the crime so it "probably was not a factor."

14.

from a hospital defendant visited in India in February 2018. He explained, this documentation from five months earlier made clear that defendant was "genuinely someone who had been diagnosed previously as being severely depressed and psychotic, and had been irrational and psychotic and depressed for quite a while."

Dr. Terrell testified defendant told him his landlord was furious and told defendant to give him $50,000 that day or he would kill him. Defendant reported he was "convinced that the landlord or one of his two sons would kill him, and that he did not have the $50,000 to give to the landlord" and he was scared. Defendant told Dr. Terrell that he held the gun and pointed it downwards towards the floor; he did not point it at anyone. The victim's son then jumped on him and a struggle for the gun ensued during which defendant was shot in the left foot, the landlord was shot in the waist area, and the landlord's son was also shot.

Dr. Terrell diagnosed defendant with "major depressive disorder, single episode, severe, with psychotic features," meaning someone who "becomes depressed to a pathological degree where it would qualify as being a major depression, typically identified by symptoms often of feeling depressed and down and blue and problems with concentrating or memory," "low energy levels," "[p]roblems with sleeping," "[p]roblems with feeling like a failure or worthless." He testified such people "can become suicidal or even homicidal from just a major depression alone. In this case it was an overwhelming and severe major depression, and even worse, there were psychotic features making him have poor contact with reality, prone to paranoid interpretations of reality, prone to being an unreliable historian of what happened in reality, because it is all tainted by the psychosis and the paranoia." "So these people can see what is normally a very friendly or professional situation and interpret it as something that is very evil, life-threatening for them, life-threatening for their family, and they can react in a very, very violent manner to protect themselves or those they love, even though it is all based on a psychotic delusion." Dr. Terrell opined when someone has depression as severe as in this case, it

15.

can significantly impair "the[ person's] mental functioning, problem solving, executive functioning, figuring out how to deal with a problem would be even more impaired. Then you add onto that a paranoid psychosis, then the ability to think things through in a rational, logical manner, and the ability to come up with a socially acceptable rational decision, would be even more impaired." He believed defendant's "mental functioning at the time of the alleged crime was severely, severely impaired by his mental illness, especially psychosis."

Dr. Terrell explained that it is very common for people accused of crimes to lie to forensic psychiatrists like him. He testified it is possible defendant was lying to him but, "given the wealth of information about how severely mentally ill, severely depressed and psychotic he was on this date," Dr. Terrell believed it was "far more likely than not" that defendant was telling him things "that even though they may not be accurate, … is what he perceived reality was in his very irrational and psychotic state of mind."

**Other Evidence**

Officer Christopher Hines testified he interviewed J.R. in the emergency room after the shooting incident. J.R. reported Nizam and defendant left the room for less than a minute and then he saw defendant walking directly behind Nizam holding a black-colored revolver. J.R. rushed over and grabbed the revolver with his right hand and he placed his right index or middle finger inside the revolver's trigger guard to try to prevent defendant from pulling the trigger. J.R. reported he then pushed the gun down towards the ground and he heard three to five loud shots from the revolver. Then, J.R. managed to pry the revolver away from defendant.

Scott James testified as a firearms expert on behalf of the defense. He examined the revolver in evidence in this case and testified it would take 11 pounds and 15 and a half ounces of force to pull the trigger. The revolver's trigger was "definitely a lot harder to pull" than the trigger of a semiautomatic gun.

16.

Moyses Ramos testified he went into business with defendant; they purchased the lease for the Aztec Store together. He testified he argued with Nizam several times about the business and rent. Ramos ultimately left the business because "there was too much arguing." Ramos stated he believed defendant to be an honest person and he had never seen defendant be violent.

Larry Williams testified he had known defendant for "25, 30 years." Williams went to defendant's store almost every day; defendant was one of his best friends. Williams did not believe defendant had a propensity for violence and could not believe the facts of this case.

The mayor of the City of Farmersville, Paul Boyer, testified he met defendant about 20 years ago and he would go to the Aztec store about once or twice a week. On July 23, 2018, Boyer went into the store and he could tell that defendant "was troubled." Defendant said, "if something happens tomorrow, you'll understand." Boyer was concerned when he got home and thought about what defendant had said that night. Boyer stopped by the store the morning of July 24, 2018, but defendant had not yet arrived. So, Boyer left and went to work.

Defendant's daughter Amrit Mundi testified she is a doctor in her last year of residency, practicing family medicine in Tucson, Arizona. She told Dr. Terrell that, in June 2017, defendant seemed "preoccupied." Defendant had lost 30 to 40 pounds, could not sleep, and "was very, very paranoid about everything." He was scared to sleep because he thought someone would rob or hurt one of them; he thought he got rabies despite not having contact with a dog; and he believed he was going to get deported, though he is a naturalized citizen. Defendant was on multiple medications including an antidepressant, fluoxetine, an antianxiety medicine, Xanax, and an antipsychotic medicine, risperidone. His primary care doctor sent him to a specialist who recommended he get a colonoscopy to look into why he was losing so much weight, but defendant refused to do it. Defendant had obsessive-compulsive tendencies, such as

17.

repeatedly washing his hands and refusing to handle change because of the germs. His symptoms were getting worse leading up to July 2018. He kept multiple wooden sticks at home by the front and back doors for his protection, and he used them like a cane to walk around at home because he was very weak. He cut his hair, which was contrary to his religion as a Sikh.

## *Verdict*

The jury found defendant guilty as charged of the murder of Nizam (§ 187; count 1), mayhem as to J.R. (§ 203; count 3), and assault with a firearm as to J.R. (§ 245, subd. (a)(2); count 4). It acquitted defendant of the attempted murder charge as to J.R. (§§ 664, 187; count 2). The jury found true allegations as to counts 1 and 3 that defendant personally used a firearm and caused great bodily injury or death (§ 12022.53, subd. (d)). It also found true allegations defendant personally used a firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)) during the commission of count 4.

## *Sanity Phase*

Following the verdict, the trial proceeded to a second phase during which the jury was tasked with determining whether the defense established defendant was legally insane at the time of the commission of the crimes. The court instructed the jury, in part:

> "You have found the defendant guilty of the crimes in this case. Now you must decide whether he was legally insane when he committed those crimes.· The defendant must prove that it is more likely than not that he was legally insane when he committed the crimes.
>
> "The defendant was legally insane if:
>
> "Number one, when he committed the crimes, he had a mental disease or defect;
>
> "And number two, because of that disease or defect, he was incapable of knowing or understanding the nature and quality of his act, or was incapable of knowing or understanding that his act was morally or legally wrong.

"Do not base a finding of not guilty by reason of insanity solely on the basis of a personality disorder, adjustment disorder, seizure disorder, or abnormality of personality or character made apparent only by a series of criminal or antisocial acts.

"You may consider any evidence that the defendant had a mental disease or defect before the commission of the crime. If you are satisfied that he had a mental disease or defect before he committed the crime, you may conclude that he suffered from that same condition when he committed the crimes.

"You must still decide whether that mental disease or defect constitutes legal insanity.…"

Dr. Raynado Garcia testified he had known defendant for approximately 25 years and was his friend and physician. In 2014, defendant reported to Dr. Garcia that he was having anxiety and panic attacks. In 2016, defendant brought Dr. Garcia a prescription for Xanax that he had obtained in India. Dr. Garcia renewed it and continued to prescribe it in May 2018. However, Dr. Garcia testified he did not know much about psychiatry and was "very poor" with regard to "assessment on psychotropic medicine." He acknowledged notes in his records that defendant was prescribed fluoxetine and Risperdal. He denied seeing defendant on the day of the shooting or the day before, and testified he would not know how defendant was behaving that day.

Gurjant Mundi testified, before the July 2018 incident, her husband had been depressed for a "very long time, and he was just not recovering." Defendant was "really weak" and eating normally but losing weight. He would say he was "dying due to the store" and because the landlord would not let him transfer the lease. Just prior to the incident, defendant stopped going to work. Defendant cut his hair though he had previously been very much against doing so.

Amrit Mundi testified again that her father was "very, very severely depressed" when she saw him a week or two before the incident. He would stay home from work and repeatedly say he was dying. Defendant told Amrit the business was killing him and he needed to get out of it. He lost a lot of weight. One day, when defendant was not

19.

wearing his turban, Amrit noticed he cut his hair. "He said it felt really heavy on his head." Amrit was worried about defendant. It was difficult to talk to him; "he would just sit and stare in space" and "[i]t was really hard to get anything out of him." After the shooting incident, defendant gained weight back and "his mood was happy."

Defendant testified he could be seen in surveillance footage taking the gun out of a drawer because he was "feeling attacked" and "scared that something can happen." He knew the cameras were on when he went to get the gun and did not turn them off because he "was not doing anything wrong." He explained, he pulled his shirt down over the gun to conceal it. He testified he had the gun to protect himself because he thought he might be attacked because he did not have the money to pay. Defendant testified he knew that a gun is capable of causing fatal injuries and he was not supposed to be waving it around. He stated he took out the gun to scare Nizam and to defend himself. Defendant denied that he intended to use the gun. There was no benefit to him to shoot or kill Nizam. He stated he was afraid Nizam would attack him and that the deal would not go through. Defendant thought he was going to die in two or three weeks.

Defendant testified, after the gun went off and he went out of the back room, J.R. came out and started throwing things at him and calling him names. J.R. started coming towards defendant and defendant ran behind the counter, grabbed the hammer, and ran towards the back room. Nizam was "trying to look at something to hit [defendant]" and defendant "hit him one time." Defendant denied having hallucinations in July 2018.

Dr. Terrell also testified again, explaining depression can become "a major depression disorder, severe, with psychotic features, where they may be delusional and paranoid and believe people are out to murder them, … and other unshakeable delusional thoughts that are untrue, despite a lack of any credible information to support it or in opposition to credible evidence that should convince them that they are not being poisoned or not really dying that a rational person would accept." It is a "very severe mental disorder that would put the person at a very high risk of suicide and a high risk of

20.

doing things that are grossly out of character …." It can alter a person's perception of reality, making the person "very paranoid and suspicious and believe people are out to murder you or murder your family." He testified psychosis can make individuals believe they are dying, though there is no evidence of it. It also commonly makes individuals believe they are in danger when they are not and can cause them to defend themselves with lethal force when there is no actual danger. Dr. Terrell explained he did not see any evidence of malingering when interviewing defendant, meaning evidence of defendant "lying or faking or concocting things" that were not consistent with a genuine mental illness or the facts.

Dr. Terrell prepared a report dated September 22, 2018, in which he diagnosed defendant with major depressive disorder, single episode, severe, with psychotic features. He explained defendant had paranoid delusions that his landlord was planning to murder him and that he was dying. He explained his review of defendant's medical records included May 2018 notes from two different doctor visits that reflected defendant's judgment and insight were impaired, suggesting "someone who's psychotic." Defendant was prescribed, alprazolam, a medication for anxiety and panic attacks, and fluoxetine for anxiety and depression. The notes acknowledged defendant was depressed and anxious, but they did not mention psychosis. Dr. Terrell opined that the individual "doing this [medical examination] has missed out on [defendant's] delusions, that he believes he's dying, that he believes the landlord, [Nizam], is causing him to die, doesn't have much time to live again." On June 12, 2018, defendant was prescribed Risperdal, which is an antipsychotic medication used to treat mental disorders such as "schizophrenia or severe major depressive-like psychiatric features or schizoaffective." However, the dosage was lower than is typical. He denied suicidal or homicidal ideation or psychosis, though Dr. Terrell noted it was unclear as to whether defendant was informed of the meaning of psychosis. Notes from defendant's July 10, 2018, doctor visit reflected defendant's

weight had not changed from May 2018, and he reported feeling better and having more energy.

Dr. Terrell opined defendant "was suffering from a severe and psychotic mental disorder which rendered him unable to comprehend the legal wrongfulness and the moral wrongfulness of his actions." Accordingly, Dr. Terrell recommended the court find defendant was "legally insane at the time of the crime." Dr. Terrell explained, when he spoke to defendant, defendant referred to his landlord as Hitler and Gaddafi, which Dr. Terrell found to be a departure from reality. "A person in a rational state of mind would not normally use that kind of description" in a situation where the person is "having a dispute over a business issue." Defendant had "a paranoid delusion" that "the landlord had been slowly killing him, but also had been planning to kill him that day." Defendant "really believe[d] in his very psychotic and irrational mind, that he had to kill the landlord. Otherwise, he would have been killed. And it is grossly out of character for him."

Dr. Terrell interviewed defendant less than a month after the incident and, strangely, defendant felt better emotionally, "the opposite of what you would expect in a situation like this." He no longer feared anyone would kill him and he told Dr. Terrell his depression and anxiety were gone and he was eating and sleeping well. Dr. Terrell believed this to be "very abnormal" and "very consistent with someone who was and still is … so psychotic that he really believed that this man was killing him … slowly and about to kill him acutely, but now he is relieved and no longer has to worry that he's going to be killed."

Doriann Hughes, Psy.D., testified she is a psychologist who was appointed by the court to evaluate defendant. She reviewed police reports, medical records, defendant's toxicology report, the autopsy report, and Dr. Terrell's September 22, 2018, evaluation of defendant. She also interviewed defendant for about 75 minutes at the jail on November 9, 2018. During the interview, Dr. Hughes performed the Miller Forensic

22.

Assessment System Test, which is a test regarding whether someone is malingering, meaning "faking symptoms of mental health." Defendant's answers "suggested he was answering honestly about his mental health symptoms." She also conducted the Rogers Criminal Responsibility Assessment, which is a "structured assessment looking at the different elements of insanity at the time of the offense."

Dr. Hughes described defendant as friendly and cooperative; he did not "exhibit any anxiety." He answered her questions and was forthcoming with information. He gave her an extensive history of his business transactions with Nizam over 15 years. He said he felt like he was dying. With regard to the incident, defendant told Dr. Hughes there was a meeting scheduled regarding the sale of the business and defendant was "afraid of the victim and his son." He told her the victim wanted a certain amount of money if the business was sold, and he threatened defendant if defendant did not provide it. He stated he did not go to the police because he was afraid and did not have enough evidence. Defendant told Dr. Hughes, on the day of the meeting, "he thought the victim might have brought a weapon with him"; the victim was waving his arms around and defendant was afraid he was going to do something to him. He stated he pulled out the gun to scare the victim and "the gun had gone off"; he was not trying to kill him. Dr. Hughes was concerned because this report was inconsistent with the police reports and seemed to be more of a "socially acceptable," "self-defense type of justification." Defendant also told her he normally kept the gun in his pocket as opposed to in a closet or container in the store, which was inconsistent with what he told the police. The inconsistency in reporting led Dr. Hughes to question the validity of defendant's report. Defendant reflected an awareness that shooting a gun could hurt or kill somebody. Defendant told her he shot the gun, the victim's son tried to intervene, and the gun went off a few times, and then he went back with a hammer and hit the victim in the head. He did not tell her he thought the victim was reaching for something before he hit him in the

23.

head; but he reported to Dr. Hughes that the victim, as opposed to the victim's son, was throwing bottles at him.

Dr. Hughes diagnosed defendant with major depression, severe with psychotic features, and an anxiety disorder. She explained he had "some paranoid ideation that was consistent with psychotic features of depression." She testified a person with his disorders is still capable of understanding that their actions can be right or wrong. She opined that defendant understood "the legal and moral wrongfulness of his actions. Based on the fact that he seemed to be aware that … a gun can harm somebody, that he wasn't trying to hurt somebody, that he was just trying to scare them, that awareness was there. He appeared to know that shooting a gun could be harmful, could be lethal to a person." Dr. Hughes testified the fact defendant provided more socially acceptable answers to her than he did to the police immediately after the incident led her to believe he was aware of the wrongfulness of his actions.

Tricia Busby, Ph.D. a licensed psychologist in clinical and forensic psychology, was also appointed by the court to evaluate defendant for the sanity phase. She reviewed medical and police reports, audio recordings of the 911 calls and other police communications from the day of the incident, a transcription of defendant's statement to law enforcement, as well as Dr. Terrell's and Dr. Hughes's reports. She also interviewed defendant at the county jail on January 11, 2019.

Defendant told Dr. Busby he normally kept his gun in his pocket, as he did on the day of the incident, which was inconsistent with his statement to police that he normally kept the gun in the closet. He told her he wanted to have the gun on him that day for protection because he was supposed to have a meeting with Nizam and his son. Defendant reported to Dr. Busby that Nizam yelled at him during the encounter but defendant did not get angry. He later stated Nizam did not yell at him. Defendant "said he felt threatened by the victim" and that Nizam "had threatened to kill him if he didn't pay him $50,000 to make the sale of the business." But the police report reflected

24.

defendant indicated he did not feel threatened until after he shot the gun. Defendant told Dr. Busby he pulled out the gun to scare the victim. So, she asked him, if he was trying to scare the victim, whether he knew the gun could be harmful to someone or cause death. Defendant then changed his answer and said he was not really trying to scare the victim. Defendant said he was not angry at the victim.

Dr. Busby used the Rogers Criminal Responsibility Assessment Scale to help structure her interview and determine if defendant met the qualifications under the California standard for not guilty by reason of insanity. She concluded defendant had a mental disorder—major depressive disorder—but "he knew the nature and quality of his actions and knew right from wrong at the time he committed the offense." He understood and appreciated the wrongfulness of his actions as evidenced by "goal-directive behavior," in that his behavior was directed at the father rather than a random, bizarre, irrational act at other people. She did not believe defendant was delusional, but instead had "legitimate symptoms from the stress he [wa]s experiencing."

Following the presentation of evidence and argument, the jury found defendant was sane during the commission of the murder (count 1), mayhem (count 3), and assault with a firearm (count 4).

### Sentencing

The court sentenced defendant to 50 years to life on count 1 (§ 187) pursuant to section 12022.53, subdivision (d); two years plus an additional and consecutive 25 years to life pursuant to section 12022.53, subdivision (d), for a total of 27 years to life on count 3 (§ 203); and two years plus an additional 10 years for the section 12022.5, subdivision (a) enhancement, and an additional three years pursuant to section 12022.7, for a total of 15 years on count 4 (§ 245, subd. (a)(2)). The court stayed the sentence on count 4 pursuant to section 654 because it was based on the same conduct as count 3.

**DISCUSSION**

## I.      Standard of Review—Sufficiency of the Evidence

On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence is "''''''whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'''''' (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)  The reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (See *People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)  "In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*People v. Powell* (2018) 5 Cal.5th 921, 944.) "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)  "'We must also "accept logical inferences that the jury might have drawn from the circumstantial evidence."'" (*People v. Navarro*, *supra*, at p. 302.)

It is the jury, not the appellate court, which must be convinced of a defendant's guilt beyond a reasonable doubt. (*People v. Rodriguez*, *supra*, 20 Cal.4th at p. 11.)  If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*Ibid*.)

## II.     Sufficient Evidence Supports Defendant's First Degree Murder Conviction

Defendant argues the evidence was insufficient to support his first degree murder conviction as to Nizam.  We disagree.

### A. Applicable Law

"'Murder is the unlawful killing of a human being, or a fetus, with malice aforethought.' (… § 187, subd. (a).) If the murder is 'willful, deliberate, and premeditated,' it is first degree murder. (*Id.*, § 189, subd. (a).) ""In this context, "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.""" [Citation.] "'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'" [Citations.] "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly…."" (*People v. Morales* (2020) 10 Cal.5th 76, 88.)

In *People v. Anderson* (1968) 70 Cal.2d 15, the California Supreme Court identified "three basic categories" of evidence generally found sufficient to sustain a finding of premeditation and deliberation: (1) planning activity, or "facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing"; (2) motive, or "facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim"; and (3) manner of killing, or "facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' …." (*Id.* at pp. 26–27; accord, *People v. Morales*, *supra*, 10 Cal.5th at pp. 88–89.)

### B. Analysis

In his first contention, defendant argues insufficient evidence supports his first degree murder conviction. He asserts Dr. Terrell's testimony, that defendant's diagnosis would make it difficult to form specific intent and would influence or impair one's mental ability, created "reasonable doubt as to whether there was any willful intent to

27.

commit murder with premeditation and deliberation." Defendant also contends "[t]he manner and means of the shooting do not present any evidence of premeditation and deliberation. But for the struggle with the firearm by the victim's son there is insufficient evidence that any shooting would have taken place, [defendant] only wanted to scare the victim." He contends his testimony together with the testimony of J.R. and the forensic pathologist "demonstrates that [defendant] did not act willfully, deliberately and with premeditation."

We conclude substantial evidence supports defendant's first degree murder conviction. That is, a reasonable factfinder could infer from the evidence presented that defendant intended to kill Nizam and the murder was willful, deliberate and premeditated.

Here, there was evidence presented, and reasonable inferences that could be drawn therefrom, that fell within all three categories of evidence identified in *Anderson* as bearing on premeditation and deliberation. (See *People v. Anderson*, *supra*, 70 Cal.2d at p. 27.) First, there was evidence of planning activity. Mayor Paul Boyer testified that, the day before the shooting, defendant told him if something happened the next day, Boyer would understand. Defendant admitted putting the gun in his back pocket in advance of the meeting with Nizam and J.R., though he normally kept it stored in a closet. There was also surveillance footage from which a reasonable factfinder could conclude defendant placed the hammer on the shelf under a hat in advance of the meeting in order to conceal it and have it readily accessible. Defendant admitted motioning for Nizam to come back into the store with him during the meeting in the back room. And then the surveillance footage depicted defendant following Nizam towards the back room and reaching for his back pocket just as he is exiting the frame of the camera. From such evidence, a reasonable factfinder could conclude defendant planned the murder in advance—he strategically armed himself with a loaded gun, placed a hammer nearby, pulled out the gun when Nizam turned his back, and committed the murder when he was

28.

outside the range of the surveillance cameras. (See *People v. Salazar* (2016) 63 Cal.4th 214, 245 [defendant's act of bringing a loaded gun with him demonstrated preparation]; *People v. Lee* (2011) 51 Cal.4th 620, 636 ["defendant brought a loaded handgun with him …, indicating he had considered the possibility of a violent encounter"].)

The manner of killing also supported a finding of willful, deliberate and premeditated murder. There was evidence defendant placed the gun at the back of Nizam's head as they walked into a small room filled with people. In his interview with police, defendant admitted firing four shots while in the back room, where he was in close proximity to the victim and multiple others. After the shooting, when everyone but Nizam exited the back room for the store, defendant ran to the back room, grabbing a hammer that was concealed under a hat on a shelf on the way, and, by his own admission, he hit Nizam in the head with the hammer. From the autopsy evidence, a reasonable factfinder could have concluded defendant hit Nizam in the head with the hammer three times and with force hard enough to fracture Nizam's skull. The jury could have relied on such evidence, including defendant's own admission that he shot the gun four times in close proximity to the victim, in concluding the manner of killing supported a finding the shooting was willful, deliberate, and premeditated. (See *People v. Salazar*, *supra*, 63 Cal.4th at p. 245 [fact victim was shot nine times in close range supported conclusion killing was deliberate]; *People v. Poindexter* (2006) 144 Cal.App.4th 572, 588 [manner of killing, three quick shots from a relatively close range, supported finding of premeditation and deliberation].)

There was also significant evidence of motive, including defendant's own statements. Immediately following the incident, defendant told police about his history with Nizam. He compared Nizam to Hitler and Gaddafi, and he blamed Nizam for his health problems. He also said he pulled out the gun because he was "angry," "furious." A jury could reasonably infer from such evidence defendant had a strong motive to kill Nizam. (See *People v. Cruz* (1980) 26 Cal.3d 233, 245 ["Defendant's pent-up

resentment toward his victim[] establishes the prior relationship from which the jury reasonably could infer a motive for the killing[]"]; *People v. Anderson*, *supra*, 70 Cal.2d at p. 27 [facts about defendant's prior conduct or relationship with victim from which jury could reasonably infer "motive" to kill victim supported finding of premeditation and deliberation]; accord, *People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102 ["the law does not require that a first degree murderer have a 'rational' motive for killing. Anger at the way the victim talked to him [citation] or any motive, 'shallow and distorted but, to the perpetrator genuine' may be sufficient"].)

The evidence of the *Anderson* factors also supports the jury's finding that defendant intended to kill Nizam. (See *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690 ["'The act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill'"]; *People v. Smith* (2005) 37 Cal.4th 733, 741 ["evidence of motive is often probative of intent to kill"]; *People v. Pettie* (2017) 16 Cal.App.5th 23, 53 [evidence shooter pointed gun at victim's face and then fired multiple shots as victim fled supported inference of intent to kill].) It is true Dr. Terrell opined that defendant suffered from a mental illness that impaired his mental functioning and his ability to think things through in a rational, logical manner and the ability to come up with a socially acceptable rational decision at the time of the shooting. However, the jury could have reasonably relied upon the referenced evidence of defendant's planning activity and evident deliberation to conclude defendant's mental illness did not interfere with his ability to intend to kill and to premeditate and deliberate Nizam's killing, and we do not reweigh the evidence. (See *People v. Halvorsen* (2007) 42 Cal.4th 379, 422; see generally *People v. Nelson* (2011) 51 Cal.4th 198, 210 ["'We do not reweigh evidence or reevaluate a witness's credibility'"].) Defendant testified he pulled out the gun to "scare" Nizam, and he knew a person could be hurt or killed by a gun, though he denied he knew that at the time of the shooting. The jury could have reasonably inferred from such

testimony, coupled with the other evidence of defendant's planning and deliberation activity, that defendant was aware a gun was lethal and shooting a person could kill. (See *People v. Halvorsen*, *supra*, at p. 422.) And, notably, the jury also had before it the surveillance footage of defendant's behavior immediately preceding and after the shooting to further evaluate whether defendant appeared capable of deliberating and premeditating the killing.

Viewing the evidence in the light most favorable to the verdict, we conclude sufficient evidence supports the jury's conclusion defendant murdered Nizam and the murder of Nizam was willful, deliberate and premeditated. Indeed, there was substantial evidence defendant had an opportunity to reflect on and consider his actions and he had the intent to kill.

We reject defendant's first contention.

## III. Substantial Evidence Supports Defendant's Mayhem Conviction

Defendant next challenges the sufficiency of the evidence to support his mayhem conviction (count 3). We conclude sufficient evidence supports his conviction.

### A. Applicable Law

"Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem." (§ 203.) "[W]ith respect to a disabling injury, the victim's disability must be more than 'slight and temporary.' [Citation.]" (*People v. Santana* (2013) 56 Cal.4th 999, 1007; see *People v. Newby* (2008) 167 Cal.App.4th 1341, 1346 ["the crime of simple mayhem has been consistently interpreted since the enactment of the Coventry Act in 1670 … to require a permanent disfiguring injury"].) "'[A]n injury may be considered legally permanent for purposes of mayhem despite the fact that cosmetic repair may be medically feasible.'" (*Santana*, at p. 1007.) "And finally, as used in section 203, the word 'maliciously'

31.

'imports an intent to vex, annoy, or injure another person, or an intent to do a wrongful act.'" (*Ibid.*)

## B. Analysis

Defendant challenges the sufficiency of the evidence to support his mayhem conviction, asserting the use of the word "maliciously" "in the definition of mayhem clearly requires proof of something more than the act was done intentionally, willfully, or knowingly," citing *People v. McKelvy* (1987) 194 Cal.App.3d 694, 701 in support. He argues there was no evidence defendant "had any intent to vex, annoy or injure [J.R.]. But for [J.R.] grabbing the gun and wrestling with [defendant], he would not have been injured." On reply, he contends J.R. "reached out and grabbed onto the firearm, either placing his right index finger and or a right middle finger inside the revolver's trigger guard to prevent [defendant] from pulling the trigger and firing the gun," and "[t]he injury to [J.R.'s] foot was caused by the wrestling of the gun from [defendant] by [J.R.]." We reject defendant's contention.

Mayhem is a general intent crime. (*People v. Newby*, *supra*, 167 Cal.App.4th at p. 1347; *People v. Park* (2003) 112 Cal.App.4th 61, 64.) "It requires no specific intent to maim or disfigure, the necessary intent being inferable from the types of injuries resulting from certain intentional acts." (*Goodman v. Superior Court* (1978) 84 Cal.App.3d 621, 624; accord, *People v. Jones* (2000) 82 Cal.App.4th 663, 668 ["Mayhem … is defined in part by the harm that results from the defendant's conduct whether or not the defendant intended that result. One who unlawfully strikes another without the specific intent to commit the crime of mayhem is still guilty of that crime if the blow results in the loss or disfigurement of a member of the body or putting out of the eye of the victim"].)

Here, there was evidence from which the jury could reasonably conclude defendant unlawfully shot at J.R. at a close range and a bullet hit J.R.'s foot and another grazed his neck. J.R. testified he had multiple surgeries on his foot and "metal stuff" put

32.

in it, but years after the shooting he still could not use it for extended periods of time without it swelling or hurting, and he was unable to engage in activities he used to enjoy as a result. In view of this evidence, a jury could have reasonably determined J.R. had been permanently disabled or disfigured and defendant had committed mayhem. (See *People v. Hill* (1994) 23 Cal.App.4th 1566, 1571–1572 [evidence victim had metal plates and wires permanently implanted in his head to hold bones in place and that the sensation in his lip was impaired supported conclusion he was permanently disabled or disfigured as required for simple mayhem]; see also *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1226 ["Firing a gun at someone at close range, which results in the victim being paralyzed, is sufficient to constitute mayhem. Defendant's apprehension of the precise effect of his shots … is irrelevant"].)

Defendant asserts there was insufficient evidence he acted maliciously, relying on *People v. McKelvy*, *supra*, 194 Cal.App.3d 694, which held the doctrine of imperfect self-defense could negate the malice required for mayhem, mitigating the crime to assault or battery. (*Id*. at pp. 701–704.) The lead opinion in *McKelvy* stated the "malice" required for the crime of mayhem was different from the "malice aforethought" required in murder, but the requisite state of mind for both crimes "is inconsistent with a genuine belief in the need for self-defense." (*Id*. at p. 702.) Accordingly, *McKelvy* held that courts should sua sponte instruct that an actual but unreasonable belief in the necessity to defend oneself will negate the malice required for mayhem. (*Id*. at p. 704.) In reaching its holding, the *McKelvy* court acknowledged that mayhem is a general intent crime, but "[n]evertheless, the inclusion of the word 'maliciously' in the definition of mayhem clearly requires proof of something more than that the act was done intentionally, willfully or knowingly." (*Id*. at p. 702.) And, "[o]ne who truly believes there is a need for self-defense cannot be said to act with intent to 'vex, injure or annoy' and may be found guilty of no more than an assault or battery." (*Ibid.*, fn. omitted.)

33.

Notably, several courts have declined to follow *McKelvy*. (See *People v. Sekona* (1994) 27 Cal.App.4th 443, 450–451, 457 [rejecting *McKelvy*'s analysis, noting mayhem "has no statutory history recognizing a malice aforethought element" or the applicability of the doctrine of imperfect self-defense]; *People v. Hayes* (2004) 120 Cal.App.4th 796, 802 [finding *McKelvy* is not "persuasive" and disagreeing that "a belief in the necessity for self-defense can negate" the intent required for mayhem]; *People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1040 [the *McKelvy* lead opinion "is not binding authority"]; *People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1169, 1168 [holding *McKelvy* "has been uniformly rejected," and the doctrine of imperfect self-defense "is limited to the negation of the malice element of murder"].) In *Sekona*, the court explained, the concept of malice under section 7, former subdivision 4—applicable to mayhem—is distinguishable from malice aforethought, concluding "the concepts are distinct and no specific intent is required to commit mayhem, the necessary intent being inferable from the types of injuries resulting from intentional acts, defendant's conduct in kicking [the victim] in the eye which resulted in an inability to see out of that eye was sufficient to constitute the crime of mayhem." (*Sekona*, *supra*, at p. 457.)

As discussed, it is well-established that mayhem is a general intent crime and, "[s]o long as general criminal intent is present, the requisite malice may be inferred from the fact of the injury." (*People v. Hayes*, *supra*, 120 Cal.App.4th at p. 805; accord, *Goodman v. Superior Court*, *supra*, 84 Cal.App.3d at p. 624 [mayhem "requires no specific intent to maim or disfigure, the necessary intent being inferable from the types of injuries resulting from certain intentional acts"]; see generally *People v. Atkins* (2001) 25 Cal.4th 76, 85 ["the term 'malicious' … does not transform an offense into a specific intent crime"].) And there is sufficient evidence here from which a reasonable factfinder could conclude defendant intentionally shot the gun and it resulted in a disabling injury to J.R.'s foot. *McKelvy* does not persuade us that any additional showing was required.

34.

Rather, we conclude sufficient evidence supports defendant's conviction of mayhem (count 3).

Accordingly, we reject defendant's second contention.

## IV.  Substantial Evidence Supports Defendant's Assault Conviction

Defendant also argues the evidence was insufficient to support his assault with a firearm conviction (count 4).  We disagree.

### A.  Applicable Law

Assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.)  Assault is a general intent crime, not a specific intent crime. (*People v. Williams* (2001) 26 Cal.4th 779, 785, 788.)  A "defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct.  He may not be convicted based on facts he did not know but should have known.  He, however, need not be subjectively aware of the risk that a battery might occur." (*Williams*, at p. 788.)  "[A]ssault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur.  Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*Id.* at p. 790.)

"Concerning the crime of assault with a firearm, '[s]ection 245, subdivision (a)(2), punishes "[a]ny person who commits an assault upon the person of another with a firearm."'" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)  "'"Once a defendant has attained the means and location to strike immediately he has the 'present ability to injure.'"'" (*Ibid.*; accord, *People v. Licas* (2007) 41 Cal.4th 362, 366–367.)

**B. Analysis**

Defendant argues the evidence was insufficient to establish he "willfully committed an act with a firearm toward [J.R.] that by its nature would directly and probably result in the application of force to [J.R.]." He asserts J.R.'s testimony was "clear" that J.R. "grabbed the gun and hand of [defendant], pulled it down towards the ground and while wrestling with the gun, shots went off hitting the victim in the stomach in a downward direction, bullets hitting both [defendant] and [J.R.] in the foot and a bullet skimming the neck of [J.R.]." He argues he "could not have predicted the outcome of how the events unfolded, especially as it related to [J.R.]," and the "evidence is completely lacking in establishing any general or specific intent to assault [J.R.]." We conclude substantial evidence supports defendant's conviction for assault with a firearm.

Here, as discussed, there was evidence, including but not limited to defendant's own statements, from which the jury could reasonably conclude defendant armed himself with a loaded firearm, positioned it at the back of Nizam's head before he walked into the back room, and then he intentionally and repeatedly fired the gun in an enclosed room in close proximity to multiple people, including J.R. Such evidence was sufficient to support a conclusion defendant was aware of facts (firing a gun in an enclosed space where multiple people were present) that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct. The jury was not required to find a specific intent to cause injury to J.R. or a subjective awareness of the risk that an injury might occur. (*People v. Williams*, *supra*, 26 Cal.4th at p. 788.) And defendant's contention that J.R. testified at trial he personally was unsure of when the shooting started does not change our conclusion. Rather, the inquiry on appeal is whether substantial evidence supports defendant's conviction. (See *People v. Lee*, *supra*, 51 Cal.4th at p. 632 ["'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon

36.

which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence'"].)  We conclude there was reasonable, credible evidence of solid value, including defendant's own statements to the police following the incident, from which the jury could have found defendant committed assault with a firearm on J.R.

We reject defendant's third contention.

## V.     Substantial Evidence Supports Jury's Conclusion Defendant Was Sane During the Commission of the Crimes

In his final issue, defendant contends he presented sufficient evidence to establish, by a preponderance of the evidence, that he was insane at the time of the commission of the crimes.  We conclude substantial evidence supports the jury's sanity finding.

### A.     Standard of Review and Applicable Law

"'Under California's statutory scheme, "[p]ersons who are mentally incapacitated" are deemed unable to commit a crime as a matter of law. (§ 26, par. [2].)  Mental incapacity under section 26 is determined by the *M'Naghten* test for legal insanity provided in section 25, subdivision (b). (*M'Naghten's Case* (1843) 8 Eng.Rep. 718, 722; *People v. Phillips* (2000) 83 Cal.App.4th 170, 173; see Stats. 2007, ch. 31, § 5, pp. 138–139.)  Under *M'Naghten*, insanity is established if the defendant was unable either to understand the nature and quality of the criminal act, or to distinguish right from wrong when the act was committed.' (*People v. Elmore* (2014) 59 Cal.4th 121, 140.)" (*People v. Powell*, *supra*, 5 Cal.5th at p. 955, fn. omitted.)

"In a sanity trial, the burden is on the defendant to prove insanity by a preponderance of the evidence.  (§ 25, subd. (b); *People v. Hernandez* (2000) 22 Cal.4th 512, 521.)" (*People v. Powell*, *supra*, 5 Cal.5th at p. 955.)  "[A] jury's finding of sanity will be affirmed if it is supported by evidence that is reasonable, credible, and of solid value, from which a reasonable trier of fact could find the defendant sane by a preponderance of the evidence." (*Id.* at p. 957.)

**B.     Analysis**

Defendant argues the record of the sanity hearing contains substantial evidence from which a reasonable trier of fact could conclude defendant was insane by a preponderance of the evidence.  He contends Dr. Busby had the facts wrong, asserting, in part, that she believed defendant was interviewed at the police station rather than in a hospital bed.  He also asserts Dr. Busby did not believe defendant that the gun went off when J.R. grabbed it since the police report stated something different; however, she was not aware J.R. had told the police and testified that he did not know when the shooting started.  He also argues Dr. Busby concluded defendant knew his actions were legally and morally wrong, though she did not ask defendant regarding whether he knew his actions were morally wrong nor did she include in her report that she asked defendant if he knew his actions were legally wrong.  Similarly, he contends Dr. Hughes was mistaken about the facts, based in part on Dr. Hughes's statement that defendant hit the victim with the hammer because the victim was throwing bottles at him, which was inconsistent with the evidence.  He also contends, Dr. Hughes "did not hear the testimony in court" of defendant or J.R. "as to when and how the gunshots went off."

Initially, we reiterate the standard of review on appeal is whether there is substantial evidence from which a reasonable trier of fact could find the defendant sane at the time of the commission of the crimes by a preponderance of the evidence.  (See *People v. Powell*, *supra*, 5 Cal.5th at p. 957.)  We further note "[i]t was for the jury to evaluate the testimony of the experts, examine the bases for their opinions and determine whom to believe."  (*People v. Chavez* (2008) 160 Cal.App.4th 882, 891.)

With these principles in mind, we conclude substantial evidence supports the jury's sanity finding.  Though the defense expert, Dr. Terrell, opined defendant was legally insane at the time he committed the crimes, the court-appointed experts, Drs. Hughes and Busby, both opined defendant was legally sane at the time of the crimes.  In rendering her opinion, Dr. Hughes explained she relied in part on her interview with

38.

defendant and his statements to the police after the crime was committed to conclude defendant knew that a gun was capable of hurting someone given his statements that he was trying to scare the victim and that he did not intend to hurt anyone. She further testified the fact defendant provided more socially acceptable answers to her than he did to the police immediately after the incident led her to believe he was aware of the wrongfulness of his actions. In concluding defendant understood the nature and wrongfulness of his actions, Dr. Busby relied in part upon defendant's "goal-directed behavior," in that his behavior was directed at Nizam rather than a random act. These court-appointed experts' testimony alone "suffices to support the jury's finding of sanity." (*People v. Powell*, *supra*, 5 Cal.5th at p. 958; accord, *People v. Chavez*, *supra*, 160 Cal.App.4th at p. 891 [substantial evidence, including opinion of one doctor, supported jury's finding defendant was sane at time of attack on deputy in jail].)

Nevertheless, defendant argues Drs. Hughes and Busby erred regarding certain facts (such as whether Nizam or J.R. threw bottles at defendant) and they failed to account for all of the evidence introduced at trial, specifically referencing J.R.'s and defendant's trial testimony that they were not certain when the shooting started. However, Drs. Busby and Hughes were entitled to rely upon defendant's own statements to the police after the shooting occurred—defendant admitted to shooting the gun four times during the incident—and his statements to the doctors—he pulled out the gun to scare Nizam—in reaching their conclusions. Such evidence provided reasonable, credible evidence of solid value to support their conclusions that defendant understood the nature and quality of his actions and the wrongfulness of his conduct. (See *People v. Powell*, *supra*, 5 Cal.5th at p. 958 ["While their testimony might not have revealed that [the doctors] took into account all of the matters raised by the defense, we are satisfied by their qualifications and the nature of their testimony that their opinions were of sufficient quality that the jury could rely on them in finding defendant sane. Nothing more is required to constitute substantial evidence"].) That is, the opinions of the two court-

appointed experts provided substantial evidence from which the jury could conclude defendant was legally sane at the time of the commission of the crimes, and thereby to reject Dr. Terrell's opinion.

Notably, all the experts agreed defendant suffered from a mental disorder, namely major depressive disorder, and both Dr. Terrell and Dr. Hughes opined defendant had major depressive disorder with psychotic features. But such a diagnosis "is not the same as legal insanity." (*People v. Powell*, *supra*, 5 Cal.5th at p. 958.) And, for the reasons stated, we conclude substantial evidence supports the jury's finding that defendant was sane at the time of the commission of the crimes.

Accordingly, we reject defendant's contention.

## DISPOSITION

The judgment is affirmed.


PEÑA, Acting P. J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.